# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-50762

United States Court of Appeals
Fifth Circuit

**FILED**

November 2, 2016

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

>           Plaintiff - Appellee

v.

ANTHONY RYAN GONZALES; STACEY LOUISE CASTILLO, also known as Stacy Louise Castillo; RAYMOND HERNANDEZ OLGIN, JR.; RUDOLFO ROMERO PAREDES,

>           Defendants - Appellants

Appeals from the United States District Court
for the Western District of Texas

Before WIENER, CLEMENT, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

Special jury questions, common in civil trials, have long been disfavored in criminal law. That aversion dates back to the pre-Founding common law, which considered special questions to be an intrusion on the jury's prerogative to give an up/down vote on guilt with no explanation. *United States v. Desmond*, 670 F.2d 414, 416–18 (3d Cir. 1982). So strong was this view that an early twentieth century commentator described it as "one of the most essential features of the right of trial by jury that no jury should be compelled to find any but a general verdict in criminal cases, and the removal of this safeguard would violate its design and destroy its spirit." G. CLEMENSTON,

No. 15-50762

SPECIAL VERDICTS AND SPECIAL FINDINGS BY JURIES 49 (1905), *quoted in United States v. Spock*, 416 F.2d 165, 181 (1st Cir. 1969).

As criminal law has grown more complex, however, the use of special jury questions has increased. The district court asked them in this case for an understandable reason: to determine whether any findings of guilt on firearm and murder offenses committed in the course of a drug conspiracy were based on a theory of direct liability, aiding and abetting liability, or conspirator liability under *Pinkerton v. United States,* 328 U.S. 640 (1946). The propriety of asking those questions, to which neither side objected, is not at issue in this appeal. The effect of the jury's answers to those special questions is. We conclude that once asked, the answers to special questions must be considered when evaluating the sufficiency of the evidence. This requires vacating some of the convictions in this case involving a brutal murder committed by a drug trafficking operation because the trial judge denied motions for acquittal by finding the defendants guilty under theories of liability the jury did not adopt.

**I.**

On May 13, 2014, Sean Lamb was found dead in the front passenger seat of his Ford Expedition in Odessa, Texas. Lamb had been shot ten times from behind his seat at close range with a gun firing nine-millimeter ammunition.

An investigation linked Lamb's death to the drug operation of Ruben Hernandez. Ruben sold cocaine, methamphetamine, and marijuana. Ruben's sister, Liz Hernandez, often stored his drugs at her apartment. In May of 2014, Liz was also helping Ruben distribute them.

On or about May 11, Ruben went to Liz's apartment with a gallon-sized bag of what he said was nine ounces of methamphetamine—more than he typically brought to her home. Johnny San Miguel, Steven Saenz, and Sean

No. 15-50762

Lamb had recently begun living with Liz,[1] and Ruben asked the three men and Liz to help him sell the meth. Ruben divided the drugs, gave each of them a small portion to sell, and, unbeknownst to Liz, left about six ounces of the meth in her purse.

When Ruben returned to Liz's apartment the next morning looking for the drugs he had left in her purse, he and Liz realized that San Miguel, Saenz, and Lamb had stolen the drugs from Liz's purse, taken her truck, and disappeared. Ruben told Liz they needed to find the drugs or his drug bosses might find their mother in Mexico and harm her. After their efforts to recover the drugs failed, Liz enlisted the help of Stacey Louise Castillo. Castillo, who considered herself a "regulator" of sorts and was often hired to find people, agreed to locate the three men and recover the stolen drugs.

On May 13, Liz, Ruben, Castillo, Anthony Gonzales, Ray Olgin, Rudy Paredes, and Noe Galan met at Liz's apartment to discuss how to find the stolen meth. Liz's son, Brian Hernandez, was there as well. Gonzales brought a camouflaged MAC-10[2] to the meeting; Castillo brought a pink and gray .38 caliber revolver. Castillo told the group she believed Lamb and Saenz were informants and they needed to "hurry up and find them and get rid of them."[3]

While the group was meeting, Brian received several text messages from Lamb, apologizing for what he, San Miguel, and Saenz had done and asking if he could get his clothes from Liz's apartment. Ruben and Castillo instructed

---

[1] San Miguel was Liz's boyfriend's brother. Saenz was San Miguel's cousin. Lamb was Saenz's friend.

[2] The Military Armament Corporation Model 10 is a compact, blowback-operated machine pistol.

[3] At this point, Lamb, Saenz, and San Miguel had separated. San Miguel testified that Saenz stole the drugs from Liz's purse but didn't tell him and Lamb about it until after they reached Saenz's grandmother's house in Levelland. San Miguel said he and Lamb tried to drive back to Liz's apartment in Odessa the next morning, but they ran out of gas on the side of the road and eventually parted ways. San Miguel called Liz and told her Saenz was the one who stole the drugs.

3

No. 15-50762

Brian to respond to Lamb's text and arrange a meeting. Lamb agreed to meet and went with two friends to the alley Brian identified as the meeting spot.

As Lamb waited for Brian in the alley, Ruben, Liz, and the others entered suddenly and positioned their vehicles so that Lamb could not escape. After allowing Lamb's two passengers to exit, Liz, Ruben, Galan, and Gonzales jumped into Lamb's Expedition, pushed him into the passenger seat, and began beating him and demanding to know where Saenz and the drugs were.

Screaming for mercy, Lamb told his assailants that Saenz was at the Parkway Inn and he would help them find him. The group left the alley and took Lamb (in his Expedition) to the Parkway Inn, but Saenz was not there. When they began beating Lamb again, he told them Saenz could be at a friend's house. On their way to this next location, Gonzales, Castillo, and Liz took a wrong turn and were separated from the rest of the group. Liz testified that Castillo later received a phone call telling her that Galan had killed Lamb. Ballistics indicated that the shots were fired from directly behind the front passenger seat, which, according to Liz, is where Galan was seated.

## II.

The government has never strayed from the position that Galan was the shooter. But it sought to hold all eight of those involved in hunting down Lamb—Liz, Brian, Ruben, Galan, Olgin, Paredes, Castillo, and Gonzales—responsible for the murder, using aiding and abetting and conspirator theories of liability. A grand jury charged them all with: (1) conspiracy to possess with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 846 and 841(a)(1); (2) the "use and carry" of a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A); and (3) murder resulting from the use of a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(j). The two firearm counts asserted

4

aiding and abetting liability under 18 U.S.C. § 2 and conspirator liability under *Pinkerton v. United States*, 328 U.S. 640 (1946).[4]

Ruben escaped to Mexico the day after Lamb's murder; he and Galan remain at large. Liz and Brian entered guilty pleas and testified for the government. That left Olgin, Paredes, Castillo, and Gonzales as defendants at the trial. The jury found them guilty on all counts.

The verdict form had more questions than is typical in criminal trials. The defendants requested that the court ask not just the general verdict question of "guilty" or "not guilty" for each count, but also special interrogatories related to Counts Two (the "use and carry" of a firearm charge) and Three (the murder charge). The government did not object to this request. The court asked the special questions to ensure that the jury was unanimous on the theory of liability in light of the multiple theories alleged.[5]

The first two interrogatories related to the "use and carry" firearm charge. Jury Question 1 asked whether each defendant was guilty of the "use and carry" firearm charge based on a theory of personal liability, conspirator's liability, or aiding and abetting. The jury found Olgin and Gonzales guilty under a theory of conspirator's liability, but found Paredes and Castillo guilty under a theory of personal liability. Jury Question 2 asked whether the

---

[4] In *Pinkerton*, the Supreme Court held that conspirators are criminally liable for substantive crimes committed by other conspirators in furtherance of the conspiracy, unless the crime "did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." 328 U.S. at 647–48.

[5] There is a pattern jury charge emphasizing the unanimity requirement that the district court used. *See* FIFTH CIRCUIT PATTERN JURY INSTRUCTION (CRIMINAL) § 1.25 (2015). But the defendants argued that the special questions were also needed to ensure unanimity given the number of defendants and theories involved. In particular, as will be seen, the defendants contended that *Pinkerton* liability does not apply to first-degree murder. A special jury question indicating whether a guilty verdict was reached on a *Pinkerton* theory would have isolated that issue for appeal and prevent the need for a retrial.

firearm was brandished, discharged, or neither; for each of the four defendants, the jury marked "brandished."

The second two interrogatories concerned the murder charge. Similar to the first interrogatory, Jury Question 3 asked the jury to determine which of the three theories of liability supported a guilty verdict on the murder charge. The jury answered that Paredes, Castillo, and Gonzales were guilty based on personal liability, whereas Olgin was guilty based on conspirator's liability. Finally, the jury was asked whether the defendants were guilty of first or second degree murder, and the jury found all four guilty of first degree murder.

Paredes, Castillo, and Gonzales moved for judgment of acquittal on all counts, but focused on Counts Two and Three. They argued that there was no evidence to support the jury's finding of "personal liability" on these counts. The district court acknowledged that the evidence showed that Galan, rather than any of the four defendants, shot Lamb, but nonetheless found that the jury's answers to Jury Questions 1 and 3—which in some instances were inconsistent with the evidence—did not control because the interrogatories were "unnecessary and inconsequential." The court thus denied the defendants' motions on the ground that "there was evidence to support the convictions of all [d]efendants under the *Pinkerton*/conspirator liability theory" even when that was not the theory the jury indicated it agreed on in its answers to the special questions.

The four defendants received the same consecutive sentences: twenty years for the drug convictions that are not challenged on appeal; seven years for the "use and carry" firearm convictions; and life for the murder convictions. They all appeal.

## III.

We first consider challenges to the murder convictions.

No. 15-50762

## A.

Castillo, Gonzales, and Paredes argue that there is insufficient evidence to support the jury's verdict that they committed murder in connection with using a firearm during a drug trafficking offense.  To recap their roles, Gonzales and Castillo recruited a group to help Liz and Ruben recover the stolen drugs.  Gonzales and Castillo brought (and later disposed of) the MAC-10 and handgun that were used during the hunt for Lamb, and they also participated in his assault.  But neither of them was present when Lamb was murdered.  Paredes, on the other hand, was in the car when Lamb was killed, but there is no evidence that he was the shooter.

A sufficiency challenge ordinarily prompts us to recite the standard of review requiring that we uphold the verdict so long as "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  That remains the ultimate issue, but a predicate legal question will determine whether the verdicts will survive that deferential review.

The question is whether the sufficiency review must be conducted in light of the special answers the jury provided or whether, as the district court held, those answers can be disregarded and the review just be based on the general verdict of guilty.  If the theory upon which the jury based its verdict in the special answers—personal or direct liability for the murder as opposed to aiding and abetting or *Pinkerton* liability—must be given effect, then the government concedes there is no evidence to support the convictions as Galan was the shooter.[6]  If, on the other hand, only the general verdict is considered,

---

[6] The government halfheartedly argues that the finding of "personal liability" could be read as a finding of *Pinkerton* liability.  It correctly observes that to be held liable under *Pinkerton*, a conspirator must have a requisite amount of "individual culpability" in the sense

then we would affirm the convictions so long as there is evidence supporting at least one theory of liability. *See United States v. Garza-Robles*, 627 F.3d 161, 166 (5th Cir. 2010) (citing *Griffin v. United States*, 502 U.S. 46, 59–60 (1991)[7]). As discussed further below when considering Olgin's sentence, that evidence exists to support *Pinkerton* liability for all the defendants as the murder was a foreseeable act committed in furtherance of the drug trafficking conspiracy.

To determine whether the answers to the special interrogatories must be given effect, we must consider their historic role in criminal law mentioned at the outset. But first, some terminology. "Special interrogatories," "special verdicts," and "special findings" are sometimes used interchangeably. *See* WAYNE R. LAFAVE, ET AL., 6 CRIM. PROC. § 24.10(a) n.1 (4th ed. 2015). A true

---

that, among other things, there had to be an individual act to join the conspiracy. Indeed, viewed in a vacuum, "personal liability" could simply mean that one is being held individually responsible for her actions. The three possible answers to the special question on murder must, however, be read in context. When the choices are "personal liability," aiding and abetting liability, or *Pinkerton* liability, personal liability cannot be the same as the *Pinkerton* liability the jury did not select. *Cf. United States v. Harris*, 420 F.3d 467, 477 (5th Cir. 2005) (explaining that a jury's answer of "manslaughter" in response to a special interrogatory "[n]ecessarily . . . reject[ed] the alternate choice of murder in either the first or second degree"). The jury's finding that a defendant personally committed the murder necessarily excluded a finding of *Pinkerton* liability, which applies only when "*another* [other] conspirator[s] committed the" substantive offense. FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CRIMINAL) § 2.17 (2015) (emphasis added).

The instruction the district court gave removes any doubt about the significance of the jury's selection of "personal liability." It described the three theories the jury could select as follows: "The first is that the defendant is personally liable for personally and knowingly using or carrying a firearm during and in relation to the defendant's alleged commission of the crime charged in Count One that resulted in the death of Sean Lamb. The second is that the defendant was a member of the conspiracy in Count One while some other co-conspirator knowingly used or carried a firearm during and in relation to that conspiracy that resulted in the death of Sean Lamb, which was committed in furtherance of or as a foreseeable consequence of the conspiracy. The third is that the defendant aided and abetted a conspirator who used or carried a firearm during and in relation to the drug trafficking crime in Count One that resulted in the death of Sean Lamb, whether or not the defendant was a member of the conspiracy in Count One."

[7] *Griffin* explains that "in the absence of anything in the record to show the contrary, the presumption of law is that the court awarded sentence on the good count only." 502 U.S. at 50 (quoting *Claassen v. United States*, 142 U.S. 140, 146 (1891)).

"special verdict" asks the jury to make specific factual findings in the absence of a general verdict, and leaves the judge to determine the defendant's guilt or innocence in light of those findings. *Id.* An example is a recent case in which the Fourth Circuit vacated the defendant's conviction for possession of a prohibited object by a federal inmate because the jury was only asked factual questions—was an exhibit a weapon and did the defendant possess the object— and never asked to give an up/down verdict on guilt. *United States v. Ramirez-Castillo*, 748 F.3d 205, 214 (4th Cir. 2014). Jury interrogatories, on the other hand, supplement the general verdict. LAFAVE, *supra* n.1. That is the appropriate term for what the district court did in this case. As will be seen below, however, much of the case law uses the "special verdict" term even when talking about interrogatories like these.

Even with respect to "[s]pecial interrogatories," we have repeated the refrain that they "should not be used in criminal trials." *United States v. Bosch*, 505 F.2d 78, 82 (5th Cir. 1974); *United States v. James*, 432 F.2d 303, 307 (5th Cir. 1970) ("We do not minimize the seriousness of the error when a trial court submits special interrogatories to the jury in a criminal case."). Much of that hostility stems from a desire not to undermine jury nullification, described by Justice Holmes as the ability of a jury "to bring in a verdict in the teeth of both law and facts." *Horning v. District of Columbia*, 254 U.S. 135, 138 (1920), *abrogated on other grounds by United States v. Gaudin*, 515 U.S. 506, 520 (1995). Although a controversial power that courts purportedly do not encourage, "the jury's power of lenity explains why the use of special interrogatories, which might 'catechize a jury as to its reasons,' has been met with a lack of judicial enthusiasm." *Desmond*, 670 F.2d at 417 (quoting Edmund M. Morgan, *A Brief History of Special Verdicts and Special Interrogatories*, 32 YALE L.J. 575, 592 (1923)). A general verdict requiring only an answer of "guilty" or "not guilty" permits a jury to reach its decision "based

more on external circumstances than the strict letter of the law." *Id.* at 418. A classic special verdict that asks the jury to decide facts, and then either directs the jury to a corresponding finding on the general verdict or results in the judge entering that finding, impairs that jury prerogative. Special verdicts have thus long been viewed as inconsistent with the principle that "not only must the jury be free from direct control in its verdict, but it must be free from judicial pressure." *Spock*, 416 F.2d at 181.[8]

We found that such improper judicial pressure resulted from a special question in *Bosch*. The trial in that drug prosecution focused on the defendant's claim that a federal agent had promised her immunity. *Bosch*, 505 F.2d at 79. The judge thus instructed the jury to answer "[d]id an agent of the United States Government promise the defendant [ ] that she would not be prosecuted for the offense charged . . . ?" *Id.* at 80. He further instructed that if the jury answered no to that special question, "then you should find the defendant guilty." *Id.* at 81. We vacated the resulting conviction, noting that "any encroachment upon the broad right to a jury's general verdict of guilty or not guilty is fraught with danger." *Id.* at 78–79.

This historic aversion to special questions has lessened in recent years, at least for interrogatories that are not accompanied by an instruction directing a finding of guilt based on the answer as was the one in *Bosch*. The same circuit that decided the *Spock* case, which is recognized as a "leading

---

[8] Another court explained:

To ask the jury special questions might be said to infringe on its power to deliberate free from legal fetters; on its power to arrive at a general verdict without having to support it by reasons or by a report of its deliberations; and on its power to follow or not to follow the instructions of the court. Moreover, any abridgement or modification of this institution would partly restrict its historic function, that of tempering rules of law by common sense brought to bear upon the facts of a specific case.

*United States v. Ogull,* 149 F. Supp. 272, 276 (S.D.N.Y. 1957), *quoted in Spock*, 416 F.2d at 181.

authority against the use of special verdicts based on their potential for leading the jury to the prosecution's desired conclusion," has since held that the statute at issue in this case—18 U.S.C. § 924—is one in which special interrogatories may be particularly appropriate because it "proscribes more than one type of conduct, with penalties that vary depending upon the acts committed." *United States v. Melvin*, 27 F.3d 710, 716 (1st Cir. 1994).    The increased complexity of federal criminal law that section 924 reflects is one reason for the greater acceptance of special interrogatories. *See United States v. Reed*, 147 F.3d 1178, 1180–82 (9th Cir. 1998) (citing numerous cases in which special questions have been upheld); *United States v. Ogando*, 968 F.2d 146, 149 (2d Cir. 1992) (expressing a "preference for special interrogatories in particularly complex criminal cases").   They have been used (1) when the government has charged a defendant with a crime in the conjunctive but may satisfy its burden of proof in the disjunctive; (2) a defendant raises the defense of insanity; (3) the jury's determination of facts will affect sentencing; and (4) the government seeks the criminal forfeiture of property from a defendant.[9]   ROBERT E. LARSEN, NAVIGATING THE FEDERAL TRIAL § 2:48 (2016 ed.).    And one of the "justifications most frequently offered for their use" is the one that motivated the questions in this case: ensuring unanimity when there are multiple

---

[9] A case we considered in which they were used is *Harris*.  420 F.3d 467.  A jury convicted the defendant of (1) carjacking, in violation of 18 U.S.C. § 2119, and (2) use of a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c) and (j).  *Id.*  Finding that the government failed to carry its burden of showing a nexus between the intent to kill or harm and the taking of the car, we reversed the convictions, noting that the jury's special verdict supported our conclusion.  *Id.* at 475.  The special verdict form asked the jury to indicate whether it found the defendant guilty of first-degree murder, second-degree murder, voluntary manslaughter, or involuntary manslaughter.  *Id.* at 476.  The jury instructions explained that murder required malice aforethought and included killings accompanied by "an intent to kill."  *Id.*  Voluntary manslaughter did not.  *Id.*  This court stated that, by selecting voluntary manslaughter, "the jury rejected a finding of murder" and instead determined "that the killing did not occur during the course of a robbery or have the element of malice."  *Id.* at 476–77.

theories of guilt. Kate H. Nepveu, *Beyond "Guilty" or "Not Guilty": Giving Special Verdicts in Criminal Jury Trials*, 21 YALE L. & POL'Y REV. 263, 283 (2003) (noting that special interrogatories in this context "can ensure that the [unanimity] issue did not get lost in the shuffle during deliberations . . . [and] may contribute to judicial economy by confirming the jury's unanimity and thus avoiding a retrial"). Although defendants have generally opposed special verdicts given the Sixth Amendment concerns stated above, a special interrogatory requiring unanimity as to the theory of conviction is usually sought by the defense as it was here.

The propriety of those interrogatories, to which the government agreed, is not at issue here. The effect of the jury's answers to them is. Although the law may be murky concerning when it is proper to give the jury special interrogatories, it is not when it comes to the effect of those interrogatories once answered. Courts consistently vacate convictions when the answers to special interrogatories undermine a finding of guilt the jury made on the general question. LAFAVE, *supra* § 24:10(a) ("A jury's special verdict finding may also negate an essential element of an offense of which the jury returned a general verdict. Unlike the situation where a verdict on one count is inconsistent with a verdict on another count, a special finding negating an element of a single count will be treated as an acquittal of that count, not as an inconsistent verdict."). At the federal level, this issue has arisen in drug cases when the jury has found the defendant guilty but then answered "none" in response to a special interrogatory about the quantity of drugs involved in the offense (a question that is asked because drug quantity can determine the minimum or maximum sentence). Despite a finding of guilt on the general drug trafficking question, courts have required a judgment of acquittal in light of the "none" answer to the drug quantity question. *United States v. Randolph*, 794 F.3d 602, 612–13 (6th Cir. 2015); *cf. United States v. Shippley*, 690 F.3d

1192, 1193 (10th Cir. 2012) (describing trial in which jury found defendant guilty of drug conspiracy but answered "none" for drug quantity, prompting trial judge to ask for further deliberations).  In the fraud arena, courts have not convicted defendants despite general verdicts of guilty when the jury answered "no" to special questions asking whether the jury had unanimously agreed that the false statement was material, *United States v. Mitchell*, 476 F.3d 539, 542–43 (8th Cir. 2007)[10], or whether the defendant had the specific intent to defraud, *United States v. Lucarelli*, 476 F. Supp. 2d 163, 169 (D. Conn. 2007).

The issue in this case is slightly different.  The special interrogatory was not asking about an element of the offense, but the theory of liability.  Yet the holding of these cases—that the special interrogatory must be given effect and can negate a general verdict of guilty—decides the fundamental question in this case.  We cannot ignore the special interrogatory answer of "personal liability" and pretend that the jury based its finding of guilt on the *Pinkerton* theory for which the jury did not check the box.  The Second Circuit reached this conclusion when considering the role of special interrogatories in the same situation we are facing.  *See United States v. Frampton*, 382 F.3d 213 (2d Cir. 2004).  The indictment charged the defendant on alternative theories: he either was a principal who used a firearm in connection with a crime of violence or he aided and abetted another defendant's commission of that crime.  *Id.* at 224.

---

[10] In *Mitchell*, the district court granted a Rule 33 motion for new trial in light of the answer to the special interrogatory showing the jury had not unanimously found the materiality element.  476 F.3d at 543.  The question on appeal was whether jeopardy had attached.  The Eighth Circuit held it had not in light of the wording of the special interrogatory which may have meant the "no" response just indicated that "some jurors found the statements material and some jurors found the statements immaterial."  *Id.* at 545.  That would be akin to a mistrial in which retrial is permitted.  The court recognized that if the answer meant "the jury unanimously found the statements immaterial," then jeopardy would have attached.  *Id.*

No. 15-50762

A jury found the defendant guilty in response to the general verdict, but the district court acquitted him because of the jury's answer to a special question that he was a principal, a theory of guilt on which the court found the evidence insufficient. The Second Circuit affirmed, recognizing that, ordinarily, precedent would dictate that it consider whether the government's evidence was sufficient to support a general verdict under either of the charged theories; the answer to the special question, however, limited the sufficiency review to the jury's chosen theory.[11] *Id.*

The only case we came across supporting the district court's view that a special interrogatory can be ignored is *United States v. Bran*, 776 F.3d 276 (4th Cir. 2015). *Bran*'s discussion of the issue is dicta, however, because the evidence was sufficient to support the verdict based on the theory the jury selected in response to the interrogatory. *See id.* at 280.

The government argues that the Supreme Court's recent decision in *Musacchio v. United States*, 136 S. Ct. 709 (2016), supports disregarding the special interrogatory and reviewing the sufficiency of the evidence in light of a *Pinkerton* theory. *Musacchio* held that when a district court instructs the jury by including an additional element that the statute does not actually require, the erroneous instruction does not govern the sufficiency review on appeal. *Id.* at 715. In explaining that holding, the Supreme Court stated that a "reviewing

---

[11] The district court in *United States v. Werme*, 1990 WL 74267 (E.D. Penn. May 31, 1990), reached a similar result. Jurors there were given two interrogatories. *Id.* at *3. The first asked whether the defendant traveled in interstate commerce with the intent to commit commercial bribery; the second asked if the defendant aided or abetted another in traveling in interstate commerce with the intent to commit commercial bribery. *Id.* The jury found the defendant "not guilty" of traveling in interstate commerce, but "guilty" of aiding and abetting. *Id.* Although the evidence established that the defendant traveled in interstate commerce on the date in question, there was no evidence that any other person traveled in interstate commerce whom the defendant could have aided. *Id.* Recognizing that the evidence did not support the theory of liability on which the defendant was convicted, district court acquitted the defendant. *Id.*

court's limited determination on sufficiency review thus does not rest on how the jury was instructed. When a jury finds guilt after being instructed on all elements of the charged crime plus one more element, the jury has made all the findings that due process requires." *Id.* This, the government says, means that the general verdict finding the defendants guilty of the murder should be affirmed because the jury was instructed on all the elements and found the defendants guilty in its general verdict. But *Musacchio* says only that jury instructions that erroneously require a jury to make additional, extraneous findings can be ignored when conducting a sufficiency review; it quite sensibly does not say that the jury's actual findings can be ignored. *See id.* at n.2. *Musacchio* did not involve the question of the effect to be given special verdicts and should not be read to undo the case law giving those jury findings legal force.

Applying it to special interrogatories, *Musacchio* actually supports a finding of insufficiency here. It explains that the sufficiency review "essentially addresses whether 'the government's case was so lacking that it should not have even been submitted to the jury.'" *Id.* (quoting *Burks v. United States*, 437 U.S. 1, 16 (1978)). The personal liability theory for which the government concedes there was no evidence as to Castillo, Gonzales, and Paredes should never have been submitted as an option for the jury and thus the verdict based on the unsupported theory must be set aside. Castillo and Gonzales were not even present when Lamb was shot. And although the jury could have concluded that Paredes was in Lamb's vehicle at the time of the shooting, testimony and forensic evidence indicate that the shots were fired from where Galan was sitting in the vehicle. Conspirators Liz and Brian also testified that it was their understanding, based on conversations the night of the murder, that Galan was the shooter.

15

The murder convictions based on the jury's findings of personal liability thus cannot stand.  Nor can we uphold the murder convictions because there might be sufficient evidence to support a *Pinkerton* theory that the jury rejected.  *See Harris*, 420 F.3d at 477 (explaining that jury's selection of one of multiple theories in response to a special question is a rejection of the other options).  Indeed, our longstanding rule that a guilty verdict can be upheld under *Pinkerton* only when the jury is instructed on that theory of liability recognizes that, for such a jury verdict to be upheld, it must be possible that the jury actually relied on *Pinkerton* in finding guilt.  *United States v. Morrison*, 833 F.3d 491, 503 n.2 (5th Cir. 2016) (rejecting *Pinkerton* as basis for affirming convictions because instruction was not given (citing *United States v. Polk*, 56 F.3d 613, 620 n.4 (5th Cir. 1995)).  This makes sense.  To find *Pinkerton* liability, a jury must make findings not necessary to a finding of personal liability, for example, that the substantive offense was committed by another conspirator in furtherance of and as a foreseeable consequence of the conspiracy.  *See* FIFTH CIRCUIT PATTERN JURY INSTRUCTION (CRIMINAL) § 2.17 (2015).  A judge cannot make those findings to convict a defendant when a jury has not.

The Sixth Amendment concern with courts' invading the jury's purview that has traditionally counseled against the asking of special questions in criminal cases would face an even greater affront if a court were to replace a jury's answer to special interrogatories with its view of how the case should have been decided.  The right to trial by jury "includes, of course, as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of 'guilty.'"  *Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993) (citing *Sparf v. United States*, 156 U.S. 51, 105–06 (1895)).

16

No. 15-50762

## B.

The jury did rely on a *Pinkerton* theory in finding Olgin guilty of first-degree murder. Recall that once Lamb was trapped in the alley, his assailants shoved him into the front passenger seat of his Expedition before beating him. Olgin got into the driver's seat and drove the group around as they searched for Saenz and the stolen drugs. He was driving the Expedition when Lamb was shot by Galan.

Olgin thus raises a different challenge to his first-degree murder conviction, arguing that *Pinkerton* liability cannot reach a substantive crime that requires the heightened *mens rea* of malice aforethought and premeditation. *Pinkerton* was a prosecution of bootlegging brothers for conspiring to violate the revenue laws. 328 U.S. 640. In upholding convictions on substantive tax counts for the less involved brother, the Supreme Court held that conspirators are criminally liable for substantive crimes committed by their fellow conspirators in furtherance of a conspiracy, unless the crime "did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *Id.* at 647–48. Although still a controversial holding in the broader world of criminal law,[12] in the federal system *Pinkerton* has long been a powerful tool for prosecutors. It continues to be applied in the fraud context that gave rise to it, but its most common application is likely in drug trafficking conspiracies like the one in this case.

---

[12] Many state courts have required a greater showing for conspirators to be held liable for substantive offenses committed during the conspiracy, the *Model Penal Code* rejects *Pinkerton* liability, and the academy's view of the decision is "overwhelmingly negative." *See* Matthew A. Pauley*, The Pinkerton Doctrine and Murder*, 4 PIERCE L. REV. 1, 4 (2005).

But the substantive offense that occurred during the course of this conspiracy—murder—is not often seen in the federal system. Does *Pinkerton* liability attach to murder? In arguing no, Olgin relies on *United States v. Cherry*, 217 F.3d 811, 817–18 (10th Cir. 2000). *Cherry* reasoned that because "first-degree murder liability incorporates a specific intent requirement far more stringent than mere foreseeability," the *Pinkerton* doctrine should not "hold co-conspirators liable for first-degree murder that was not the original object of the conspiracy." *Id.* at 818. To do so, the court said, "would apparently render every minor drug distribution co-conspirator, regardless of knowledge, the extent of the conspiracy, its history of violence, and like factors, liable for first-degree murder," a result that "appears incompatible with the due process limitations inherent in *Pinkerton.*" *Id.*

Yet as even the Tenth Circuit has more recently recognized, holding a defendant responsible for a co-conspirator's acts—even murder—does not violate due process when those acts "were within the scope of the conspiracy and thus necessarily foreseeable to the other members of the conspiracy." *United States v. Rosalez*, 711 F.3d 1194, 1207 (10th Cir. 2013). The defendant in *Rosalez* helped plan the assault of fellow inmate, Pablo Zuniga-Garcia. *Id.* at 1199. Zuniga died as a result of the assault, and the men involved were charged with a number of crimes, including second-degree murder. *Id.* at 1200–01. Rosalez, who planned but did not participate in the beating, argued that subjecting him to *Pinkerton* liability violated due process because the murder was not the original object of the conspiracy—they were only supposed to beat Zuniga. *Id.* at 1206–07. Despite its earlier holding in *Cherry*, the Tenth Circuit concluded that holding Rosalez responsible for his co-conspirators' acts did not violate due process. *Id.* at 1207. The court reasoned that, given the number of attackers and weapons involved, it was reasonably foreseeable that Zuniga might die from the assault; therefore, the murder "was

not an act that occurred separately from the assault, but rather was a direct, and entirely foreseeable, result of the vicious assault carried out on him." *Id.* The Eleventh Circuit has ruled similarly. *See United States v. Alvarez*, 755 F.2d 830, 848–51 (11th Cir. 1985) (finding that, because the defendants had actual knowledge of at least some of the circumstances and events leading up to the murder and were aware that Alvarez might use deadly force to avoid going back to prison, "the relationship between the [defendants] and the murder was not so attenuated as to run afoul of the potential due process limitations on the *Pinkerton* doctrine"); *see also United States v. Britt*, 112 F. App'x 352, 355 (5th Cir. 2004) (affirming a *Pinkerton* instruction for the offense of murder committed in furtherance of a continuing criminal enterprise though defendants did not challenge *Pinkerton*'s general applicability to murder); *United States v. Thompson*, 286 F.3d 950, 965 (7th Cir. 2002) (explaining that *Pinkerton*'s reasonable foreseeability requirement captures the specific intent requirement for first-degree murder).

Lamb's murder was at least as foreseeable (probably more so) to the conspirators in this case than were the murders to the conspirators in *Rosalez* and *Alvarez*. Members of the drug trafficking organization were armed with weapons, determined to retrieve the drugs, and fearful of the consequences they might suffer if they failed. They lured Lamb into an alley, cornered, beat, and kidnapped him. And when his information on Saenz's whereabouts proved unfruitful, members of the group became increasingly upset. It was reasonably foreseeable that someone might use one of the weapons to make Lamb or Saenz turn over the stolen drugs. As the Second Circuit observed, "[t]he death of a victim is a natural consequence of a robbery which is premised on the use of overmastering force and violent armed confrontation." *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007); *see also Alvarez*, 755 F.2d. at 848–49 (finding that, based on the amount of drugs and money involved, the jury could infer

that the conspirators would know that at least some conspirators would be carrying weapons and deadly force would be used if necessary to protect the conspirators' interests).    If any doubt remains that everyone who went searching for the drugs that night knew that a murder was possible, there is Castillo's comment earlier that evening that Lamb and Saenz were informants whom they had to "get rid of."  We affirm Olgin's murder conviction that the jury based on *Pinkerton* liability.

## IV.

We turn now to the convictions for using or carrying a firearm while committing a drug trafficking crime.   18 U.S.C. § 924(c).   We address two challenges.   One again involves a question about the effect of the special interrogatories.  The other is a double jeopardy argument.

## A.

The district court used special interrogatories for the section 924(c) count because of the graduated penalties that offense provides depending on how the weapon is used.  Doing so made sense in light of *Alleyne v. United States*, 133 S. Ct. 2151 (2013), which held that the facts enhancing a minimum sentence under that statute are elements of the offense for a jury to decide rather than sentencing factors a judge can decide.   *Id.* at 2162.   Using or carrying the firearm results in a five year minimum sentence.  18 U.S.C. § 924(c)(1)(A)(i). Brandishing the firearm elevates that minimum to seven years.   18 U.S.C. § 924(c)(1)(A)(ii).   Discharging results in a ten year minimum.   18 U.S.C. § 924(c)(1)(A)(iii).    After the verdict form asked the jury whether the defendants were guilty of using or carrying the firearm in connection with drug trafficking, it thus asked an additional question in which the jury could check a box for "brandished," "discharged," or "neither."  The form also asked another special question akin to the one asked for murder: was liability for any section

924(c) conviction based on "personal liability," "conspirator's liability," or "aiding and abetting"?

For Castillo and Paredes, the two defendants who challenge the sufficiency of the evidence for this count, the jury found them guilty of "use and carry" in response to the general verdict. Then, in response to the special interrogatories, it stated that their guilt was based on personal liability and that each brandished a firearm.[13] Following the same reasoning it used in upholding the murder convictions, the district court upheld the brandishing convictions based on its belief that it could do so under a *Pinkerton* theory even though the jury did not base its verdict on such. For the reasons we have already discussed, once a special interrogatory is asked, the jury's answers have legal force. We can thus consider the sufficiency of the evidence to support a brandishing theory only in light of the personal liability theory on which the jury based its verdict.

The evidence supports the verdict that Paredes personally brandished a firearm. To "brandish" a firearm means "to display all or part of the firearm, or otherwise make the presence of the firearm known to another person, in order to intimidate that person, regardless of whether the firearm is directly visible to that person." 18 U.S.C. § 924(c)(4). Two witnesses who lived in a house facing the alley where Lamb was initially assaulted testified. Larry Hodge stated that on the night of the murder he heard "screaming and hollering" from the alley and went to investigate. He saw the assault and considered trying to "break them up," but changed his mind when he saw a man coming from his left in a red shirt holding what looked like a camouflaged

---

[13] Gonzales and Olgin likely do not raise sufficiency challenges to the 924(c) conviction because the jury checked "conspirator's liability" for them, so they would be guilty so long as any conspirator committed the foreseeable act of brandishing a firearm in furtherance of the conspiracy. *See United States v. Dean*, 59 F.3d 1479, 1490 n.20 (5th Cir. 1995).

"machine gun." Larry's wife, Trudy, testified that this same man was not one of the people assaulting Lamb. Videos from the Parkway Inn, the first place the group took Lamb after abducting him from the alley, show Paredes wearing a red shirt. Paredes points out that Ruben was also wearing a red shirt. But testimony suggests that after Ruben arrived in the alley, he joined Liz, Gonzales, and Galan to interrogate and beat Lamb in his vehicle. So the jury could have reasonably concluded that the man Larry Hodge saw wearing the red shirt and carrying the camouflaged gun in the alley—the one Trudy Hodge said was *not* hitting Lamb—was Paredes, rather than Ruben.

Paredes argues that, even if all this allowed the jury to conclude that Paredes was carrying the gun in the alley, it still does not amount to brandishing as there is no evidence that Lamb ever saw the gun. But if the jury believed that Paredes was the man carrying the machine gun in the alley, it could have reasonably found that this amounted to displaying it in a threatening manner. Larry Hodge testified that he considered trying to break up the assault but changed his mind because, after seeing the man with the gun, he feared for his and his wife's safety.

As for Castillo, the government concedes that "[t]here was no testimony that she brandished either the handgun or the MAC-10." We agree with the government, however, that there was sufficient evidence of her guilt on the basic section 924(c) carrying offense, which is a lesser included offense. The evidence shows that Castillo used a firearm to "protect or facilitate" the group's drug trafficking efforts. *See United States v. Baptiste*, 264 F.3d 578, 588 (5th Cir. 2001), *modified in other respects*, 309 F.3d 274 (5th Cir. 2002). Castillo carried in her purse a pink and gray .38 caliber revolver to the meeting where they arranged for Lamb's abduction. There was also testimony that the day after Lamb's murder, Castillo and Gonzales tried to sell both her revolver and the MAC-10 that was used to kill Lamb. The jury could have reasonably

inferred that Castillo wanted to get rid of her handgun because it had been used in Lamb's abduction and was thus associated with his murder. The appropriate remedy in this situation when the evidence supports a conviction for a lesser included offense is to vacate the sentence and remand for resentencing under the lesser carrying offense. *See Theriault v.United States*, 434 F.2d 212, 214–15 (5th Cir. 1970). Castillo will be resentenced under the five year minimum that applies to a "use and carry" conviction.

## B.

All four defendants argue that sentencing them for both (1) the use and carry of a firearm during a drug trafficking offense (in violation of section 924(c)) and (2) firearm murder in relation to a drug trafficking offense (in violation of section 924(j)) violates double jeopardy. Because we are vacating the murder convictions for all but Olgin, only he can still press this argument.[14] *See Brown v. Ohio*, 432 U.S. 161, 165 (1977) (stating that "[w]here consecutive sentences are imposed at a single criminal trial, the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense").

The Double Jeopardy Clause provides, as relevant here, that no "person [shall] be subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. Amend. V. This court has not addressed whether this prohibits cumulative punishment under sections 924(c) and 924(j). The First, Second, and Sixth Circuits have held or indicated that sentencing for the same conduct under both sections 924(c) and 924(j) does violate double jeopardy. *See United States v. Sanchez*, 623 F. App'x 35, 38 n.1 (2d Cir. 2015) (noting that a section

---

[14] Given that we are affirming his murder conviction with its life sentence, Olgin's additional punishment for the 924(c) offense has no practical effect at present. Nonetheless, we still must address the legal validity of the brandishing conviction. It has legal effect and could still have practical effect in the event something happens to the murder conviction or life sentence in the future.

924(c) conviction was vacated without opposition by the government because it was a lesser included offense of the section 924(j) charge); *United States v. Wilson*, 579 F. App'x 338, 348 (6th Cir. 2014) (holding the district court erred by imposing sentences under both section 924(c) and section 924(j) because the former is a lesser included offense of the latter); *United States v. Garcia-Ortiz*, 657 F.3d 25, 27–31 (1st Cir. 2011) (holding that the conviction and sentence under section 924(c) must be annulled because section 924(c) is a lesser included offense of 924(j)). Although not confronted with a double jeopardy challenge to convictions under both section 924(c) and section 924(j), the reasoning of an Eleventh Circuit case indicates that court would allow punishment under both provisions. *See United States v. Julian*, 633 F.3d 1250, 1252–57 (11th Cir. 2011) (concluding that Congress intended section 924(j) to define a distinct offense from 924(c) and that it is "irrelevant for Double Jeopardy purposes" that proof of a violation of section 924(j) "always proves a violation of [section] 924(c)" (citations omitted)).

Although the government takes the position that the First Circuit's decision in *Garcia-Ortiz* is "better reasoned" and that there is a double jeopardy problem, the district court rejected this concession that the sentences imposed for Counts Two and Three should be merged. Siding instead with the Eleventh Circuit, the district court imposed sentences for both counts, finding that section 924(c) and section 924(j) are "distinct offenses, which Congress intended to punish in separate and consecutive fashions." We review this issue de novo. *See United States v. Deshaw*, 974 F.2d 667, 669 (5th Cir. 1992).

Section 924(c) provides in pertinent part:

[A]ny person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a

firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—

(i)  be sentenced to a term of imprisonment of not less than 5 years;

(ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and

(iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

18 U.S.C. § 924(c)(1)(A).  It is well accepted that these are aggravated offenses for which a single act involving a firearm can result in only a single conviction and sentence.

A separate subsection of the statute provides:

A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall . . . be punished by death or by imprisonment for any term of years or for life . . . ."

18 U.S.C. § 924(j).  Every element of section 924(c) is also an element of section 924(j); therefore, a person who violates section 924(j) necessarily violates section 924(c).  As such, section 924(j) amounts to the "same offense" as section 924(c) for purposes of the Double Jeopardy Clause.  *See Blockburger v. United States*, 284 U.S. 299, 304 (1932) (establishing a test for determining whether two different statutes punish the same offense and explaining that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied . . . is whether each provision requires proof of a fact which the other does not").

We recognize, though, that "[w]ith respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366 (1983).  This means that "[w]here . . . a legislature specifically authorizes cumulative

No. 15-50762

punishment under two statutes, regardless of whether those two statutes proscribe the 'same' conduct under *Blockburger*," a defendant may receive cumulative punishment. *Id.* at 368–69.

We saw that very result in *Missouri v. Hunter*, when the Supreme Court vacated a judgment setting aside a defendant's sentence for armed criminal action on double jeopardy grounds. *Id.* at 369. The Missouri court had ruled that double jeopardy prohibited the defendant from being sentenced on both first-degree robbery and "armed criminal action" arising from the same conduct. *Id.* at 362–63. Under the state's robbery statute, "[e]very person convicted of robbery in the first degree by means of a dangerous and deadly weapon and every person convicted of robbery in the first degree by any other means shall be punished by imprisonment by the division of corrections for not less than five years. . . ." *Id.* at 362 (quoting Mo. Rev. Stat. § 560.135 (Supp. 1975)). The statute proscribing armed criminal action provides:

> [A]ny person who commits any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous or deadly weapon is also guilty of the crime of armed criminal action and, upon conviction, shall be punished by imprisonment by the division of corrections for a term of not less than three years. *The punishment imposed pursuant to this subsection shall be in addition to any punishment provided by law for the crime committed by, with, or through the use, assistance, or aid of a dangerous or deadly weapon.*

*Id.* (quoting Mo. Rev. Stat. § 559.225 (Supp. 1976) (emphasis added)). The emphasized language made "crystal clear" the legislature's intent to impose cumulative punishment. *Id.* at 362, 368.

We made a similar finding based on the language of section 924(c)—one of the statues involved here—in *United States v. Singleton*, 16 F.3d 1419 (5th Cir. 1994). The defendants argued that double jeopardy barred punishing them for both carjacking (under section 2119) and a firearms charge (under

section 924(c)). *Id.* at 1421. We held that section 924(c)—which provides that the punishment shall be "in addition to the punishment provided for [the predicate] crime of violence or drug trafficking crime"—demonstrates on its face "that Congress intended for § 924(c)'s five-year sentence to be imposed cumulatively . . . ." *Id.* at 1425. We concluded, therefore, that a defendant may receive cumulative punishment for violating section 924(c) and the carjacking statute that serves as the underlying crime of violence, even though the two statutes failed the *Blockburger* test.     *Id.* at 1429. We reached the same conclusion in a case in which the defendant was convicted of both a section 924(c) violation and a section 844(i) offense of damaging property by means of an explosive. *See United States v. Nguyen*, 117 F.3d 796, 797 (5th Cir. 1997).

Important features of the statutes at issue in those section 924(c) cases and *Hunter* are lacking in subsections (c) and (j) of the firearm statute we are considering. Most importantly, the express language demonstrating the legislature's intent for cumulative punishment is absent in section 924(j). It provides a sentence including death or life without noting that the sentence should run consecutively to a section 924(c) offense. As for section 924(c), it provides that its sentence should run consecutive to any sentence for the underlying drug offense or crime of violence, which it will for the drug conspiracy conviction here as it did for the predicate offenses in *Singleton* and *Nguyen*. It says nothing, however, about a section 924(c) sentence running consecutively to a sentence for a section 924(j) conviction. There is a separate provision in section 924(c) stating that "no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person." 18 U.S.C. § 924(c)(1)(D)(ii). But that prohibition on concurrent sentences is a much weaker basis from which to discern legislative intent to impose multiple punishments for what is treated as the same offense under *Blockburger* than can be found in the affirmative

statutory commands *Hunter* and *Singleton* relied on that call for consecutive sentences with respect to particular types of other offenses.  Mo. Rev. Stat. § 559.225 (providing for punishment in addition to that for another offense involving use of dangerous or deadly weapon); 18 U.S.C. § 924(c)(1)(A) (providing for sentence "in addition to the punishment provided for such crime of violence or drug trafficking crime"); *see also Albernaz v. United States*, 450 U.S. 333, 342 (1981) (recognizing that Congress is "aware of the *Blockburger* rule and legislate[s] with it in mind" so the test should control a double jeopardy question absent an indication to the contrary in a statute).

Also noteworthy, and different from *Hunter* and *Singleton*, which both dealt with separate statutes, is that we are faced with subsections of the same law.  That also makes it less likely that Congress intended sentences for subsections 924(c) and (j) to be imposed for the same conduct, especially absent any express textual evidence of such a desire.  *See Nguyen*, 117 F.3d at 797 n.1. What is more, section 924(j) expressly incorporates section 924(c) and requires a violation of section 924(c) before the penalties set forth in section 924(j) can be imposed.  Most courts of appeals have thus "fairly interpreted [§ 924(j)] as an additional aggravating punishment for the scheme already set out in § 924(c)."  *United States v. Allen*, 247 F.3d 741, 769 (8th Cir. 2001), *cert. granted, judgment vacated on other grounds*, 536 U.S. 953 (2002); *see United States v. Battle*, 289 F.3d 661, 667 (10th Cir. 2002) (holding that section 924(j) was not a discrete crime from section 924(c)).

We read the statue the same way and thus do not see an intent by Congress to impose cumulative punishment under both subsections for the same conduct.  The one case pointing in the other direction, *Julian*, did not involve a double jeopardy question.  Instead, the defendant was convicted on two section 924(j) counts because he used two firearms in committing a murder in connection with what was both a crime of violence and drug offense (robbery

of a drug dealer). 633 F.3d at 1251–52. The way the case was charged actually supports the view that punishment should not be imposed for both a section 924(c) and a section 924(j) violation. The defendant was not charged with separate section 924(c) offenses; the murder counts listed a violation of both section 924(c) and section 924(j) as giving rise to a single offense. *Id.* at 1252. The district court sentenced the defendant to consecutive life sentences for the two convictions. *Id.* On appeal, the defendant argued that the consecutive sentences were not required because section 924(j) is a separate offense to which section 924(c)'s prohibition on concurrent sentences does not apply. *Id.* The Eleventh Circuit agreed, following the plain language of section 924(c)(1)(D)(ii), which applies the prohibition on consecutive sentences only to that subsection of the statute. In doing so, it rejected the government's argument that treating section 924(c) and section 924(j) as separate offenses would create a double jeopardy problem. It did so on the ground that section 924(c) provides for a sentence "'in addition to' any other sentence." *Id.* 1256–57 (quoting 18 U.S.C. § 924(c)(1)(A)). But that misread the statute, which provides only that a sentence under section 924(c) shall be "in addition to the punishment provided for such crime of violence or drug trafficking crime, 18 U.S.C. § 924(c)(1)(A)," not in addition to "any other sentence."[15]

We thus follow the majority view in the courts of appeal (and the government's view) that there is insufficient indication that Congress intended

---

[15] *Julian* also relied heavily on then-governing precedent providing that the means of committing a section 924(c) offense—use, brandishing, and discharge—are just sentencing factors, whereas section 924(j) sets forth murder as an element of the offense. 633 F.3d at 1253–55, 1257 (citing *Harris v. United States*, 536 U.S. 545 (2002)). The Supreme Court has now reversed course and overruled *Harris* to hold that section 924(c) sets forth separate elements that must be proven to a jury. *Alleyne*, 133 S. Ct. at 2162–63. *Julian*'s distinguishing between the two subsections because one sets forth sentencing factors and the other an element thus no longer holds. They all set forth elements, yet that would not cause one to say that a defendant could be sentenced twice under section 924(c) for both carrying and brandishing a firearm.

sentences to be imposed under both subsection 924(j) and the lesser included offense of subsection 924(c) for the same conduct to overcome the *Blockburger* presumption. The Double Jeopardy Clause requires that we vacate Olgin's section 924(c) conviction for brandishing.

## V.

The convictions on the drug conspiracy count are not challenged on appeal. Two of the defendants, Gonzales and Olgin, do challenge their sentences for that offense, contending that a cross reference for murder should not have been used in their Guidelines calculation.

The cross reference elevates the offense level in a drug case to that of a murder case "[i]f a victim was killed under circumstances that would constitute murder . . . ." U.S.S.G. § 2D1.1(d)(1). Use of the offense level for murder resulted in a Guidelines range of life in prison. Although the district court could not impose that life sentence in light of the statutory maximum for the drug charge, the elevated Guidelines range resulted in the defendants being sentenced to that maximum, which is twenty years.

Gonzales objected to the cross reference in the trial court; Olgin did not. But the different standard of review does not matter as we find the cross reference was properly applied.

The defendants' challenge to the cross reference is essentially the same as the argument we have already rejected challenging the evidentiary basis for *Pinkerton* liability on the murder count. Indeed, the relevant conduct principles of the Guidelines largely track the *Pinkerton* standard. For sentencing purposes, a defendant can be liable for conduct that is (1) "within the scope of the jointly undertaken criminal activity," (2) "in furtherance of that criminal activity," and (3) "reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). For the reasons stated above, Lamb's murder was a foreseeable act within the scope of the drug conspiracy

each defendant entered into.  And our vacating of Gonzales's murder conviction because the jury did not find *Pinkerton* liability for him is of no consequence to finding him responsible for the murder as a sentencing matter.  *See United States v. Rodriguez-Reyes*, 714 F.3d 1, 13–14 (1st Cir. 2013) (finding that application of first-degree murder cross reference following defendant's drug conviction was not plain error, even though defendant was acquitted of murders in state court); *United States v. Smith*, 224 F.3d 766, 2000 WL 992504, at *6–7 (5th Cir. 2000) (finding that, even though the defendant was not convicted of murder, the district court did not err in applying the Section 2D1.1 cross reference).  There is no error in the twenty year sentences on the drug count.

**\* \*\***

The result of this appeal—the murder conviction of one defendant being upheld while the conviction for three other defendants who seem at least as culpable being set aside—will no doubt seem arbitrary.  Some arbitrariness is inevitable in a jury system, but the Founders thought it would be more prevalent in a system in which judges decided guilt: "Arbitrary impeachments, arbitrary methods of prosecuting pretended offenses, and arbitrary punishments upon arbitrary convictions, have ever appeared to me to be the great engines of judicial despotism; and these have all relation to criminal proceedings."  *See* THE FEDERALIST NO. 83, at 467 (Alexander Hamilton) (Clinton Rossiter ed., 1961).  The justice system they designed to protect against those concerns does not allow us to uphold convictions based on a theory that the trial court adopted but the jury rejected.

To summarize our ruling, for the Count One drug conspiracy charge, we **AFFIRM** the sentences of Gonzales and Olgin.  For the Count Two section 924(c) charge, we **AFFIRM** Gonzales's and Paredes's convictions; **VACATE** Castillo's conviction and **REMAND** for resentencing under the lesser included

carrying offense; and **VACATE** Olgin's conviction. For the Count Three section 924(j) charge, we **VACATE** Castillo's, Gonzales's, and Paredes's convictions and **AFFIRM** Olgin's conviction. The case is remanded for Castillo's resentencing and entry of judgment for all defendants consistent with this opinion.

No. 15-50762

EDITH BROWN CLEMENT, Circuit Judge, dissenting as to Part III.A:

The jury found Castillo, Gonzales, and Paredes guilty of murder in connection with using a firearm during a drug trafficking offense, in violation of 18 U.S.C. § 924(j). The majority's decision to vacate the Section 924(j) convictions ignores the jury's general verdicts of guilty. *See United States v. Bran*, 776 F.3d 276, 280 (4th Cir. 2015) (explaining that "the jury's general guilty verdict alone is sufficient to uphold [defendant's] § 924(j) conviction").

*Musacchio v. United States*, although not directly controlling, is instructive. *See* 136 S. Ct. 709 (2016). The Supreme Court held that "a sufficiency challenge should be assessed against the elements of the charged crime, not against the erroneously heightened command in the jury instruction." *Id.* at 715. A special interrogatory requiring the jury to select a theory of liability is analogous to an additional, unnecessary element in a jury instruction. The special interrogatories here did not concern a material element of guilt, and the unnecessary inclusion of the special interrogatories imposed a heightened burden on the government. "When a jury finds guilt after being instructed on all elements of the charged crime plus one more element, the jury has made all the findings that due process requires." *Id.* I would consider only whether there is sufficient evidence to support the general verdicts that Castillo, Gonzales, and Paredes committed murder in connection with using a firearm during a drug trafficking offense.

"Sufficiency review essentially addresses whether 'the government's case was so lacking that it should not have even been submitted to the jury.'" *Id.* (quoting *Burks v. United States*, 437 U.S. 1, 16 (1978)). There was clearly enough evidence to submit the Section 924(j) charges to the jury. The majority concedes that "evidence exists to support *Pinkerton* liability for all the defendants as the murder was a foreseeable act committed in furtherance of

33

the drug trafficking conspiracy." There is sufficient evidence, under the theory of conspirator's liability, to support the jury's general verdicts of guilty. I would not vacate Castillo's, Gonzales's, and Paredes's Section 924(j) convictions. Accordingly, I dissent.